1
2
3
4
5
6
7

SPENCER HOSIE (CA Bar No. 101777)
shosie@hosielaw.com
DIANE S. RICE (CA Bar No. 118303)
drice@hosielaw.com
GEORGE F. BISHOP (CA Bar No. 89205)
gbishop@hosielaw.com
HOSIE RICE LLP
Transamerica Pyramid
600 Montgomery Street, 34th Floor
San Francisco, CA 94111
(415) 247-6000 Tel.
(415) 247-6001 Fax

8
9

*Attorneys for Plaintiff*
*MASTEROBJECTS, INC.*

10

11
12

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

13

14

MASTEROBJECTS, INC.,

15                    Plaintiff,

16    v.

17    YAHOO!, INC.,

18                    Defendant.

19

Case No.  C 11-2539 JSW

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

**[PATENT L.R. 4-5]**

20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

Page

I.    INTRODICTION AND SUMMARY ............................................... 1

II.   STATEMENT OF FACTS: MASTEROBJECTS' INVENTIONS AND
      PRODUCTS ............................................................... 3

III.  THE LAW ............................................................... 5

IV.   CLAIMS TERMS .......................................................... 6

         A.    "Content Source(s)" ......................................... 6

         B.    The Cache Terms ............................................. 9

                  1.    "Content-Based Cache/Query and Result Cache" ...... 9

                  2.    "Unified Query and Result Cache/Unified Query Cache" 11

         C.    The Communication and Protocol Terms ........................ 12

                  1.    "Asynchronous Connection" ......................... 13

         D.    "Communication Protocol" ................................... 14

         E.    "Session/User Session" ..................................... 16

         F.    "Increasingly Appropriate Content or Search Criteria" ...... 19

         G.    "Increasingly Relevant Content" ............................ 20

V.    CONCLUSION ............................................................ 20

# TABLE OF AUTHORITIES

Case                                                                 Page

*Computer Docking Station Corp. v. Dell, Inc.*,
    519 F.3d 1366 (Fed. Cir. 2008)                                      5

*Intergraph Hardware Techs. Co. v. Toshiba Corp.*,
    508 F.Supp.2 752 (N.D. Cal. 2007)                                  20

*International Development LLC v. Richard*,
    2010 W. 4703779 (D.N.J. 2010)                                      20

*Kara Technology, Inc. v. Stamps.com Inc.*,
    582 F3d 1341 (Fed. Cir. 2009)                                       6

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)                                 5-6, 9, 15

In accord with Rule 4-5 of the Patent Local Rules of the United States District Court for the Northern District of California, plaintiff MasterObjects, Inc. ("MasterObjects") respectfully submits this Opening Claim Construction Brief.

## I.   INTRODUCTION AND SUMMARY.

In 2011, Yahoo! introduced what it characterized as "the first real fundamental change in search in more than a decade." *See* "Under the Hood-The Tech Powering Search Direct." Hosie Decl., Ex. A.  In contrast to traditional search, where the user types in a full query, hits submit, and then waits for the results, the new Yahoo! technology showed both suggested queries *and* corresponding results as the user typed, character-by-character. This was "instant" search -- real-time results as the user typed.  Yahoo! branded this product as "Search Direct," and it is ubiquitous today.

To take an example, assume a user was interested in information on the Madison Square Garden.  With Yahoo!'s Search Direct, the first three letters typed ("Mad") provides "Madonna" as the first suggested query with corresponding results, an interesting comment on the culture today.  But the fourth letter, "Madi," produces a list with Madison Square Garden third.  By the time the user types in "Madison S," the first highlighted query is Madison Square Garden, and topical information about the venue appears on the user's screen right then and there.  In a world where seconds matter and computer users have gnat-like patience, this technology is far faster and more accurate than the former hit submit and await response loop.

Yahoo! was justly proud of its Search Direct product.  Indeed, it thought the technology so novel that it filed numerous patent applications covering all aspects of Search Direct.  And Yahoo! was at least part right – the invention **was** new and novel when first claimed.  But it was not new for Yahoo!, as this technology was first developed, claimed, and

sold by a Netherlands based search product company, MasterObjects, more than a decade ago.  MasterObjects filed its first "instant" search patent in August 2001, it now has three issued patents, all asserted here.[1]

Given Yahoo!'s wholesale endorsement of Search Direct's novelty, this case will turn on claims construction.  Pragmatically, claims construction is a result-oriented process.  Even so, a party's proposed construction should at least bear some resemblance to the language of the claims and description in the specification.  Yahoo!'s proposed constructions do not.

Yahoo! consistently does three things wrong.  First, the company takes a narrow term in one specific embodiment and then limits the general claim to that one specific embodiment.  *See* § IV below.  Importing a limitation from one specific embodiment into a claim wars with basic claims construction law.  *See* below § III.  Under Yahoo!'s approach, a patent could never be broader than its narrowest embodiment, an approach that Yahoo! would no doubt find grievously offensive in its role as patent plaintiff.  *See Yahoo!, Inc. v. Facebook*, 3:12-CV-01212.

Second, Yahoo! often uses the definition for one term, *e.g.* "content engine," to define a **wholly different** term, *e.g.* "content source."  *See* below § IV.A.  It is not helpful to define a Buick by referencing a banana.

Third, Yahoo! often injects new and profoundly vague terms into its constructions, *e.g.* "maintaining state."  These new terms themselves would make for a robust claims fight.  Construction is all about simplifying and narrowing issues; Yahoo!'s imaginative constructions do exactly the converse.

---

[1]     U.S. Patent No. 7,752,326, "System and Method for Utilizing Asynchronous Client Server Communication Objects," July 6, 2010 ("'326"); U.S. Patent No. 8,060,639, "System and Method for Utilizing Asynchronous Client Server Communication Objects," November 15, 2011 ("'639"); and, U.S. Patent No.

… (Footnote continued on next page) …

In contrast, MasterObjects' constructions are simple and dead faithful to the language of the claims and descriptions in the specifications. They capture exactly the bargain between the inventor and the PTO. They should be adopted here.

## II.   STATEMENT OF FACTS: MASTEROBJECTS' INVENTIONS AND PRODUCTS.

In 1999 and 2000, Mark Smit was a young computer scientist working on relational databases and complex document search and retrieval issues for a technology company near Amsterdam. He found the technology frustrating and slow, and thought he could build a better mousetrap. Accordingly, he left his job, and put his life savings in a new company founded to develop better search technology. He called the company MasterObjects, and it still exists today.

By the summer of 2001, Mr. Smit had fully conceived of a new search paradigm. He created a way to have instant results provided, character by character, as the user typed. There were several critical parts of this invention, as follows:

**Asynchronous Communication**

In the old search model, the communication was "synchronous," *i.e.*, the server would sit idle until the user hit submit, whereupon the server would do its work, and then return the information to the client. As the client worked, the server waited; as the server communicated, the client waited (think tennis). To break this "request-response" loop, Mr. Smit understood that he needed a new communication protocol that was asynchronous, *i.e.*, the client and the server could talk to each other at **any** time during a session, in a non-blocking way, *i.e.*, both could communicate at once. It is the difference between a walkie-talkie ("roger, over") and a telephone (where the parties can speak at any time, even

---

8,112,529, "System and Method for Asynchronous Client Server Session Communication," February 7, 2012

… (Footnote continued on next page) …

simultaneously).  This "asynchronous communications protocol" let the client and the server exchange information on a character by character basis, all as the user typed.

## Caching

Along the same lines, Mr. Smit understood the importance of storing ("caching") prior queries and corresponding results.  Critical to making instant search possible is the notion of storing the most common prior queries and the search results for those queries.  With these stores, known as "caches," the system had the speed to associate a few characters of a nascent request with a pre-existing copy of the same query and results thereto, and provision the right results right away.

## "Session": the more you type, the more accurate the information you get

Also critical was the notion of a "session," *i.e.*, the time period where a user sits down and types in a query, *e.g.* Madison Square Garden in our example.  As each letter is entered, the search becomes increasingly focused, and the results returned increasingly accurate; Mad becomes Madi, then Madison S, and then out pops Madison Square Garden.  In computer science terms, the lengthening query "string" produces increasingly relevant and responsive information.

In August 2001, Mr. Smit filed the first of what would be three patent applications.  The specification explicitly describes all of the above aspects, and fully enables the instant search invention.  This application was followed by the two others, and by early 2012, MasterObjects had issued to it the three patents asserted here.

("'529").

After it filed its first application, MasterObjects built an Instant Search product, known as the QuestObjects[2] System.  It hired employees, including software developers and business people, and entered into the market in 2004.  It made some significant sales, including large sales to Hewlett-Packard, Siemens, and Princeton University.  HP and Siemens used the MasterObjects' Instant Search product in their worldwide  internal networks (to find people).  Princeton University uses the product today to find things on its main website and, in 2011, purchased a license for additional uses.

By late 2008, it became clear that MasterObjects was not going to be able to compete successfully against the Googles and Yahoo!s of the search world.  Indeed, in 2010, Google released its version of Instant Search, which it creatively called "Google Instant,"[3] which was closely followed by Yahoo!'s "Search Direct."  With Yahoo! and Google giving away instant search functionality, MasterObjects was and remains hard pressed as an operating concern, although it remains in business today.

## III.     THE LAW.

 In interpreting a patent claim, "the court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history."  *Computer Docking Station Corp. v. Dell, Inc*., 519 F.3d 1366, 1373 (Fed. Cir. 2008).  Extrinsic evidence, including dictionaries, can also be useful in claim construction.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005).

---

[2]        "Quest": a search for something.

[3]        Google also filed numerous patents on its copycat instant search technology.  *See, e.g.*, U.S. Patent No. 7,836,044 ("Anticipated query generation and processing in a search engine") (Kamvar et al.).  These Google patents mirror MasterObjects' much earlier patents.

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312.  The "words of a claim are generally given their ordinary and customary meaning," as understood by "person of ordinary skill in the art." *Id*. at 1313.  The "context of the surrounding words of the claim" also "provide substantial guidance." *Id*. at 1314.

Accordingly, the "patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims." *Kara Technology Inc. v. Stamps.com Inc*., 582 F.3d 1341, 1348 (Fed. Cir. 2009). *Accord, Phillips*, 415 F.3d at 1323 ("although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments").

## IV.   CLAIMS TERMS.

The terms in dispute break into four analytically distinct groups: (1) "**content source**," (where the search results come from); (2) the two "**cache**" terms (where search results are stored for instant retrieval); (3), the two **communication protocol** terms (how the machines talk to one another); and, (4) "**session**" (a specific search session, *e.g.*, looking for information on Madison Square Garden or the weather in Sunnyvale).  In addition, Yahoo! argues that two terms are vague to the point of being indefinite (which is rarely a question appropriate for claims, and certainly not so here).

### A.   "Content Source(s)."

| Claims | Claim Term | MasterObjects' Proposed Construction | Yahoo!'s Proposed Construction |
|---|---|---|---|
| '326:1; '529:1, 44,45 | "content source(s)" | A server computer that provides information. | A server computer that provides data to a third-party application that is capable of performing string-based queries and returning string-formatted answers to the system by |

| | | | accessing its own database or by querying other information systems. |
|---|---|---|---|

Plaintiff defines "content source" simply and plainly: "A server computer that provides information." This is exactly what the claims say in describing how information is retrieved: the system stores "content or other information previously retrieved from the server system **or one or more content sources**…." '529 Claim 1, Hosie Decl., Ex. B. Information is retrieved from a content source, *e.g.*, a server with weather information, or another server with information on geographic locations. *See also* '326 Claim 1 ("one or more content sources that store content").[4] Hosie Decl., Ex. C. It would be hard to put this more plainly.

Along the same lines, the '326 specification specifically defines a content source in one embodiment, as follows: "Content source: A server computer that provides the data that is accessed by the QuestObjects System [a preferred embodiment]." Hosie Decl., Ex. C at 10:22-32.

Yahoo!'s proposed construction is considerably more baroque. Yahoo! agrees that a content source is a server that provides data, with data presumably being a synonym for information. So far, so good. But Yahoo! then lards the term up with a series of limitations wholly unsupported in the claim language, specification, or prosecution history. It says that a content source must be just one particular kind of server, specifically one "capable of performing of string-based queries and returning string-formatted answers." It then adds that it must be a server that operates in one particular way – by "accessing its own database or

---

[4]     *See also* '639 patent at 10:22-32 ("Content source: A server computer that provides the data…"). Hosie Decl., Ex. D.

querying other information systems."  This is a lot of weight for the simple term "content

source" to carry.

So, whence these limitations?  Remarkably, Yahoo! supports these imaginative

limitations by looking at a wholly different term "**content engine**," as that term is used in

one specific embodiment.  For example, it quotes the specification of the '326 patent at

10:11-21, which defines "Content engine" as one element of one embodiment:

> Content Engine – A content engine is a third-party application that
> runs on the content source that is **capable of performing string-**
> **based queries and returning string-formatted answers to the**
> **QuestObjects system**.  Examples include relational databases,
> corporate directories, and search engines.  A simple content engine
> could read information directly from a file, or could perform a
> query to access a Web Service over the Internet.

*Id.*  Here, in this specific embodiment, we see at least part of the limitation Yahoo! seeks to

import into the claim.

There are two points here: first a "content engine" is not a "content source."  **These**

**are different terms.**  Indeed, Yahoo! even cites the language from the '326 patent that

makes this distinction clear:

> **Content Source** – a server computer that provides the data that is
> accessed by the QuestObjects System.  **The content source makes**
> **its data available through a content engine….**  The
> QuestObjects Server can be linked to **any number of content**
> **sources**.  To retrieve specific information from the content source,
> one or more content channels are configured on the QuestObjects
> Server.

*See id.* at 10:22-32; quoted at Yahoo!'s portion of Joint Claims Construction Statement at 41.

So, a content engine (search engine) goes to a content source, *e.g.*, a server with information

on it about the Madison Square Garden.  The definition of a "content engine" has no business

being cobbled onto the definition of "content source."

Second, even the definition of content engine that Yahoo! likes comes from **one specific embodiment**.  It is an embodiment, not a definition of the term for the claims proper.  This embodiment cannot confine the claims.  *See Phillips*, 415 F.3d at 1323.

## B.   The Cache Terms.

There are two basic cache terms: "content caches" and "**unified** query and results caches."

### 1.   "Content-Based Cache/Query and Result Cache."

| Claims | Claim Term | MasterObjects' Proposed Construction | Yahoo!'s Proposed Construction |
|---|---|---|---|
| '529: 1, 44, 45;<br>'639: 1, 13 | "content-based cache/query and result cache" | A cache which stores previous queries and content or other information returned in response to the previous queries. | A persistent store of queries and corresponding result sets executed by a content engine for a specific content channel, thus improving performance on recurring queries and limiting the load imposed on content engines.  Memory that stores an index file that aids in retrieval of queries and result sets, but does not store those queries and result sets, is not a cache. |

Claim 1 of the '529 patent defines a "content based cache" as a cache which "stores previous queries and corresponding result sets."  Hosie Decl., Ex. B.  This term is also defined in the '529 specification in exactly the same way: "content based cache – a persistent store of queries and corresponding result sets…."  *Id.* at Col. 10, l. 16-18.  The prosecution history is fully in accord.  *See* Appeal Br. at 30 ("Claim 1 includes the feature of a content-based cache, at the server system, which stores previous queries and corresponding result sets…").  Hosie Decl., Ex. E.

Claim 1 of the '639 patent likewise defines a "query and result cache" as a cache that stores prior queries and "content results previously returned from the server."  '639 Claim 1, 4:10-15.  Hosie Decl., Ex. D.

Against MasterObjects' clear construction, Yahoo! festoons the claim language with numerous unsupported limitations.  Yahoo! starts with the definition in the specification, a "store of queries and corresponding result sets…."  So far, so good, again.  But Yahoo! does not stop there.  Instead, it adds three new limitations to the straightforward claim language. It says that a content based cache must also (1) "improve performance" and (2) "lighten the load" of the system, whatever that may mean (How improve performance?  By how much?).[5] It also injects something truly quite random, that (3) "[m]emory that stores an index file that aids in retrieval of queries and result sets, but does not store those queries and result sets, is not a cache."

None of these additional limitations are in the claim language.  Without question, Yahoo! is simply reading them in.  To even attempt to do so, it must have **explicit** support in the specification or, failing that, a clear disavowal of claim scope in the prosecution history. Yahoo! has neither.

Yahoo! begins by citing the prosecution history of a different term ("unified query and result cache") in one embodiment in a different patent (the '326 patent).  Why should a description of a different term in one embodiment in a different patent overcome the plain language in the '529 and '639 claims, and explicit definition in the specification itself? Yahoo! nowhere explains this prestidigitation.

Nor is there any prosecution history estoppel here.  Yahoo! points to one paragraph in an appeal brief, which discussed one piece of prior art, known as Curtis.  That Brief underscored that the Curtis reference did not provide any caching whatsoever: it was not a cache-based solution.  Instead, as is true for all search engines, Curtis describes reviewing the

---

[5]    This new limitation could itself be the subject of a robust claims hearing.  But the purpose of

… (Footnote continued on next page) …

contents of the Worldwide Web, and then creating an index to those contents.[6]  This is profoundly unlike the MasterObjects' caching solution, as was made clear in the MasterObjects' Appeal Brief:

> **Curtis describes a search engine that uses an index file.**  The index file contains locations of data items, pointers to other index files or empty designations.  Curtis does not store queries and result sets.  Curtis instead stores URL information along with the data associated with that URL.  The system of Curtis indexes the Internet using the index file.  **The system of Curtis does not appear to do caching at all**; the index file aids in the search of URLs but does not cache a response.

'529 File History 8/22/11 Appeal Br. at 25-26, Hosie Decl., Ex. E.  Saying that a prior art reference does no "caching at all," while the patented system does, is exactly the converse of disavowing caching.

To have prosecution estoppel apply, there must be a clear disavowal of claims scope. Such disavowal is not remotely present in this case.

## 2. "Unified Query and Result Cache/Unified Query Cache."

| Claims | Claim Term | MasterObjects' Proposed Construction | Yahoo!'s Proposed Construction |
|---|---|---|---|
| '326: 1, 18 | "unified query and result cache/unified query cache" | A cache for a plurality of clients which stores previous queries or content or other information returned in response to the previous queries. | A persistent store of queries and corresponding result sets, common to all users, executed by a content engine for a specific content channel, thus improving performance on recurring queries and limiting the load imposed on content engines.  Memory that stores an index file that aids in retrieval of queries and result sets, but does not store those queries and result sets, is not a cache. |

---

construction is to narrow, not proliferate, disputes.

[6]      Search engines crawl and then index the web.  The searches are run against these indices, not against the vast and motely array of web pages proper.

The two "unified" cache terms add the word "unified."  MasterObjects adds the language "for a plurality of clients" to capture this, while Yahoo! stays with its complex, multi-layered definition and adds "common to all users."  That is, the "unified query and result cache" term adds one additional issue: does "unified" mean "common to all" (Yahoo!) or for a "plurality of users" (MasterObjects)?

The claim itself answers this.  For example, '326 Claim 1 reads as follows:

> A system for searching at a client for content at a server or other
> content sources, comprising:
> a communication protocol that provides an asynchronous
>     connection between each of **a plurality of clients** and a
>     server,…
> a requesting client of the **plurality of clients**,…
> a server, which is configured to access one or more content sources
>     that store content and that can be accessed by the server to
>     respond to the queries from the clients, wherein the server
>     further includes a unified query and **result cache common to
>     the plurality of clients**….

'326 Claim 1, Hosie Decl., Ex. C.

This language is clear: the cache is common to a "plurality of the clients," *i.e.*, more than one.

Given this clear claim language, where does Yahoo! derive its response for the "common to all" limitation?  Once again, Yahoo! seizes upon language in the QuestObjects-specific embodiment,[7] and then reads the "common to all" language into the claims generally.  As noted above, this is contrary to elementary claims construction law.

## C.     <u>The Communication and Protocol Terms.</u>

---

[7]     In its Joint Claims Construction filing, Yahoo! cites the following: "Unified Query Cache – The QuestObjects Server caches query results in a cache that is common to all users…."  '326 patent at 8:7-10.  This is, again, the QuestObjects embodiment, and nothing more.

There are two communication terms "asynchronous connection" and "communication protocol."

### 1.    **"Asynchronous Connection."**

| Claims | Claim Term | MasterObjects' Proposed Construction | Yahoo!'s Proposed Construction |
|---|---|---|---|
| '326: 1, 18; '639: 1, 13; '529: 1 | "asynchronous connection" | A connection that allows one side of the communication to communicate at the same time the other side is also communicating within a session. | A connection that allows both the client and server to initiate communications at any moment in time. |

The parties' definition for "asynchronous connection" sounds very similar.  What, then, is the issue?

Yahoo! says that an asynchronous connection protocol means that a server can initiate communications "at any moment in time."  MasterObjects says that the server can initiate communications at any time **within a session**.

These three words matter.  Under Yahoo!'s construction, the server would have to be capable of sparking off  a communication with a client at any time **regardless** of whether the client had even initiated a search request and regardless if there were a "connection' between the two.  It is as if one were sitting at a computer, looking say at Facebook, when the server suddenly sent unsolicited search results.  ("Hello!  Interested in search results for the Madison Square Garden?")  This is simply not how search works.  A user has to start a search session.  That is why it is a "**connection**;" once the user begins to type a search query, there is a connection, there is a search session, and the server can then communicate asynchronously.  MasterObjects did not patent a system that originates random, spam search results.  That would be an absurd reading and an absurd outcome.

It is also a reading wholly at odds with the language of the claims themselves.  The claims explicitly state that the asynchronous communications occurs within the context of a "session," *i.e.*, a client-server search session.  For example, '529 Claim 1 reads as follows:

> [A] communication protocol that enables **an asynchronous connection** over a network between a client system and a server system, and allows the client system to send via the network, **and within a session between the client system and the server system**, a lengthening string… **while asynchronously receiving consecutive responses** from the server system as the characters are being input….

Hosie Decl., Ex. B (emphasis added).  This is a conversation, not a telemarketing robo call.

This claim makes explicit that there is a "connection" between client and server, a "session" between the two, and that the client and the server communicate asynchronously so that the server can send back search results even as the user continues to type, all within a search session.  The specification so states.  All of the prosecution history accords.[8]

**D.**   **"Communication Protocol."**

| Claims | Claim Term | MasterObjects' Proposed Construction | Yahoo!'s Proposed Construction |
|---|---|---|---|
| '326: 1, 18; '639: 1, 13; '529: 1, 44, 45 | "communication protocol" | A set of rules that enable computers to exchange messages with each other. | A set of rules or standards designed to enable computers to connect with one another and to exchange information and that is optimized for sending single characters from a client to a server and lists of strings from the server to the client. |

MasterObjects defines "communication protocol" simply as "a set of rules that enable computers to exchange messages with each other."  This is how the term is used in the

---

[8]   *See, e.g.*, 4/11/05 Response in '529 prosecution history at p. 12 ("Since a session is maintained between the client and the server, the server can immediately check the validity of the client or user input against the server content as the user is entering a portion of a search string.  Unlike HTTP or another session-less protocols, the server does not have to wait until the user submits an entire input form.").  Hosie Decl., Ex. F.

claims, *e.g.*, '639 Claims 1, 13 ("a communication protocol that enables an asynchronous connection…").  And this term is really just the companion to "asynchronous connection." That is, the communication protocol **enables** an asynchronous connection over a network between a client system and a server system.

Yahoo!, as per its practice, takes this plain meaning and then adds an unsupported limitation, specifically, a protocol "optimized for sending single characters from a client to a server and lists of strings from a server to the client."

This is not, of course, what the claims say.  So, what is Yahoo!'s support for this additional limitation?  Once again, Yahoo! seizes a specific description in one preferred embodiment, the QuestObjects System, and then reads that embodiment-specific limitation into the claims proper.  For example, the '529 specification makes clear the language Yahoo! cites relates to one specific embodiment, the QuestObjects System, as follows:

> In the detailed description below, **an embodiment** of the present invention is referred to as QuestObjects, and provides a system for managing client input….  The invention includes a Server, that handles requests for information from **clients, and a communication protocol that is optimized for sending signal characters from a Client to the Server, and lists of strings from the Server to the Client**.

Hosie Decl., Ex. B at 9:48-50, 11:55-59 (emphasis added).  Each of the three patents describes the QuestObjects' specific embodiment in this way.  But it is wrong to say that the general claim language is limited to this narrow embodiment alone.  Were this true, a patent's claims would be only as broad as the narrowest specific embodiment.  That is not the law.  *See Phillips supra*, at 1323.

### E.      "Session/User Session."

| Claims | Claim Term | MasterObjects' Proposed Construction | Yahoo!'s Proposed Construction |
|--------|-----------|--------------------------------------|-------------------------------|
| '326: 1, 18; '639: 1, 13; '529: 1, 44, 45 | "session/user session" | A related set of communications between a client and a server as the user enters a particular search query by entering consecutive characters. | A state maintained between a client and a single server in which the server recognizes when subsequent requests originate from the same user such that information about the user's past queries is required to process the current request. |

"Session" and its variant "user session" have plain and common sense meaning: a search session when a computer user sits down and starts to look for something online. This activity – the act of a specific search – is a user search session. How else would one describe this?

This plain meaning is set out in the claims themselves:

> [A] communication protocol that enables an asynchronous connection over a network between the client system and the server system, and allows the client system to send via the network, **and within a session between the client system and the server system**, a lengthening string… to query the server system for string-based content, while asynchronously receiving consecutive responses from the server system as the characters are being input.

*Id.* at Claim 1 (emphasis added).  A user typing in m, then a, then d, then i (for Madi) is involved in a search session.

In the MasterObjects' claims, each consecutive character is associated with the existing characters, as against being considered a brand new freestanding request.  That is, when the user types in the fourth letter in the example above to get "Madi," the system knows that it is looking for results responsive to "Madi," *not results responsive to a freestanding "i."*  This is because the system is user session-based, such that the typing of

additional characters makes the string longer, more focused, and the results correspondingly more focused and accurate.  And so we get from Madonna to Madison Square Garden.

This meaning of session is explicitly set forth in the specification, as well.  For example, the specification for '529 says the following:

> Roughly described, the invention provides a session-based bi-directional multi-tier client-server asynchronous information database search and retrieval system for sending a character-by-character string of data to an intelligent server that can be configured to immediately **analyze the lengthening string character-by-character and return to the client increasingly appropriate database information** as the client sends the string.

*Id.* at 8:25-33 (emphasis ours).  The user sits down, starts to type, and the system returns increasingly relevant content.

MasterObjects' proposed definition captures the description in the claims and specification exactly.  A session is a related set of communications between a client and a server as the user enters a particular search query by entering consecutive characters.

In contrast, Yahoo!'s proposed construction is at once complex and ambiguous.  Yahoo! says that session means (1) "a state maintained between a client and server," such that (2) the server "recognizes when subsequent requests originate from the same user," **and** such that (3) "information about the user's past queries is required to process the current request."

To start, it is not remotely clear what this means.  What does it mean to say that "state" is maintained between the client and single server?  If the object of claims construction is to simplify and clarify, Yahoo! undefined notion of "state" maintained

between the client and a single[9] server simply serves to proliferate disputes.  More, Yahoo! appears to be arguing the server recognizes when subsequent requests originate from the same user.  Is Yahoo! saying that the server somehow maintains a log of all particular prior queries from a particular user, and then somehow uses this historical information stretching back days, months or even years to process a current account?  This sort of historical by client recordkeeping is nowhere in the specification or the claims, and would be unworkable as a practical matter just given the sheer scale of search and retrieval.

Along the same lines, Yahoo!'s additional requirement that "information about the user's past queries is required to process the current request" is likewise wholly unsupported and unworkable.  What information about past queries?  For how long?  And how is such information "required to process the current request?"

These limitations are a transparent effort by Yahoo! to whittle the scope of the claim down to the point of non-existence.  Yahoo!'s new limitations are simply imaginary, and have no place being read into the simple phrase "session."

Yahoo! cites one thing in support for at least some of its additional limitations: a specific embodiment in the '529 patent.  That specification describes one specific embodiment, the QuestObjects System, in great detail.  As to the session in this one embodiment, the specification reads as follows:

> In accordance **with one embodiment** of the invention the system is session-based, in that the server knows or recognizes when subsequent requests originate at the same Client.

'529 Specification at 12:9-11, *id.*

---

[9]     And why one single server?  The specification is explicit that there can be multiple servers involved in the back end.  *See, e.g.*, '529 specification at 5:67-6:2 ("A plurality of servers can be used…").  Hosie Decl., Ex. B.

This text is clear: it is just one embodiment.  Again, as it has done consistently in this claims dispute, Yahoo! takes a narrow notion specific to one embodiment and then reads that limitation into the general claims.  This is simply not how it works.[10]

**F.      "Increasingly Appropriate Content or Search Criteria."**

| Claims | Claim Term | MasterObjects' Proposed Construction | Yahoo!'s Proposed Construction |
|--------|-----------|--------------------------------------|--------------------------------|
| '326: 18; '529: 44, 45 | "increasingly appropriate content or search criteria" | Plain meaning. | Indefinite. |

Yahoo! argues that the term "increasingly appropriate content" is fatally indefinite.

It is not.  The specification in all three patents carefully describes what this term means: as the user types in additional characters during a search session, the server asynchronously returns increasingly relevant and accurate content.  Madonna becomes Madison Square Garden as the user continues to type.  For example, here is an example from the '326 specification:

> FIG. 18 illustrates the type of information that is dynamically returned to the user as they enter input data.  Although there is no "submit" or similar button, since the client maintains a session with the server, and automatically sends and receives information from the server as data is entered, the server provides the client with increasingly appropriate information from the database.

Hosie Decl., Ex. C at 26:4-10.  If one is looking for information on Madison Square Garden, Madonna is less relevant than the results for Madi (which lists Madison Square Garden third)

---

[10]      Yahoo! also cites some prosecution history, which largely repeat the language in the embodiment. These responses repeat the language of the specification dealing with the embodiment because they, too, are discussing the specific embodiment, not the claim generally.

and which is in turn less relevant than the result set for Madison S (Madison Square Garden first). This is increasingly relevant and appropriate content.[11]

Courts rarely take up indefiniteness challenges on claims construction, and do not for a very good reason. Indefiniteness typically turns on competing expert declarations, depositions, and other extrinsic evidence. Yahoo!'s burden is high on proving indefiniteness; it must show by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claims. *See International Development LLC v. Richard*, 2010 W. 4703779 (D.N.J. 2010). *See also Intergraph Hardware Techs. Co. v. Toshiba Corp.*, 508 F.Supp.2 752, 773 n. 3 (N.D. Cal. 2007) (indefiniteness inappropriate at claims stage).

If Yahoo! truly thinks it has an indefiniteness argument, let it file a summary judgment motion.

G.    **"Increasingly Relevant Content."**

| Claims | Claim Term | MasterObjects' Proposed Construction | Yahoo!'s Proposed Construction |
|---|---|---|---|
| '326: 1, 18; '639: 1, 13 | "increasingly relevant content" | Plain meaning. | Indefinite. |

The issue on "increasingly relevant content" mirrors that for increasingly appropriate content. Yahoo! says the term is fatally indefinite. It is not, and indeed is clearly set out in the specification.

V.    **CONCLUSION**.

For the foregoing reasons, Implicit respectfully requests that this Court enter MasterObjects' proposed claim constructions.

---

[11]    *See, e.g.*, '529 9/11/2006 Remarks at 14 (the server "returns increasingly matching content" as the user types). Hosie Decl., Ex. G.

1    Dated: June 5, 2012                   Respectfully submitted:

2

3                                          */s/ Spencer Hosie*                      _____

4                                          SPENCER HOSIE (CA Bar No. 101777)
                                           shosie@hosielaw.com
5                                          DIANE S. RICE (CA Bar No. 118303)
                                           drice@hosielaw.com
6                                          GEORGE F. BISHOP (CA Bar No. 89205)
                                           gbishop@hosielaw.com
7                                          HOSIE RICE LLP
                                           Transamerica Pyramid
8                                          600 Montgomery Street, 34th Floor
                                           San Francisco, CA 94111
9                                          (415) 247-6000 Tel.
                                           (415) 247-6001 Fax
10

11                                         Attorneys for Plaintiff
                                           *MasterObjects, Inc.*
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28