1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MASTEROBJECTS, INC.,

        Plaintiff,

  v.

YAHOO!, INC.,

        Defendant.

_____/

No. C 11-02539 JSW

**CLAIM CONSTRUCTION ORDER**

     The Court has been presented with a technology tutorial and briefing leading up to a hearing pursuant to *Markman v. Westview Instruments, Inc.,* 517 U.S. 370 (1996).  This Order construes the disputed claim terms selected by the parties, which appear in the three patents at issue in this case:  United States Patent No. 7,752,326 ("the '326 Patent") called "System and Method for Utilizing Asynchronous Client Server Communication Objects," a continuation of the '326 Patent, United States Patent No. 8,060,639 ("the '639 Patent") called "System and Method for Utilizing Asynchronous Client Server Communication Objects," and United States Patent No. 8,112,529 ("the '529 Patent") called "System and Method for Asynchronous Client Server Session Communication."

**BACKGROUND**

     MasterObjects, Inc. ("MasterObjects") contends that defendant Yahoo!, Inc. ("Yahoo!") infringes three of its patents.  MasterObjects' patents provide a method for sending a character-by-character string of data to a server, which analyzes the lengthening string of characters and returns to the client increasingly appropriate information.

The Court shall address additional facts as necessary in the remainder of this Order.

**ANALYSIS**

**A.      Legal Standard.**

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water*, *Inc*. *v*. *Safari Water Filtration Sys*., *Inc*., 381 F.3d 1111, 1115 (Fed. Cir. 2004).  The interpretation of the scope and meaning of disputed terms in patent claims is a question of law and exclusively within the province of a court to decide. *Markman*, 517 U.S. at 372.  The inquiry into the meaning of the claim terms is "an objective one." *Innova/Pure Water*, 381 F.3d at 1116.  As a result, when a court construes disputed terms, it "looks to those sources available to the public that show what a person of skill in the art would have understood the disputed claim language to mean." *Id*.  In most cases, a court's analysis will focus on three sources:  the claims, the specification, and the prosecution history. *Markman v. Westview Instruments*, *Inc*., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  However, on occasion, it is appropriate to rely on extrinsic evidence regarding the relevant scientific principles, the meaning of technical terms, and the state of the art at the time at the time the patent issued. *Id.* at 979-981.

The starting point of the claim construction analysis is an examination of the specific claim language.  A court's "claim construction analysis must begin and remain centered on the claim language itself, for that is the language that the patentee has chosen to particularly point out and distinctly claim the subject matter which the patentee regards as his invention." *Innova/Pure Water*, 381 F.3d at 1116 (internal quotations and citations omitted).  Indeed, in the absence of an express intent to impart a novel meaning to a term, an inventor's chosen language is given its ordinary meaning. *York Prods*., *Inc. v. Cent. Tractor Farm & Family Center*, 99 F.3d 1568, 1572 (Fed. Cir. 1996).  Thus, "[c]laim language generally carries the ordinary meaning of the words in their normal usage in the field of the invention." *Invitrogen Corp. v. Biocrest Mfg*., *L.P*., 327 F.3d 1364, 1367 (Fed. Cir. 2003); *see also Renishaw v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) (recognizing that "the claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in

United States District Court

For the Northern District of California

all cases with the actual words of the claim"). A court's final construction, therefore, must accord with the words chosen by the patentee to mete out the boundaries of the claimed invention.

The court should also look to intrinsic evidence, including the written description, the drawings, and the prosecution history, if included in the record, to provide context and clarification regarding the intended meaning of the claim terms. *Teleflex*, *Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324-25 (Fed. Cir. 2002). The claims do not stand alone. Rather, "they are part of 'a fully integrated written instrument.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) (quoting *Markman*, 52 F.3d at 978). The specification "may act as a sort of dictionary, which explains the invention and may define terms used in the claims." *Markman*, 52 F.3d at 979. The specification also can indicate whether the patentee intended to limit the scope of a claim, despite the use of seemingly broad claim language. *SciMed Life Sys.*, *Inc. v. Advanced Cardiovascular Sys.*, *Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) (recognizing that when the specification "makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question").

Intent to limit the claims can be demonstrated in a number of ways. For example, if the patentee "acted as his own lexicographer," and clearly and precisely "set forth a definition of the disputed claim term in either the specification or prosecution history," a court will defer to that definition. *CCS Fitness*, *Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). In order to so limit the claims, "the patent applicant [must] set out the different meaning in the specification in a manner sufficient to give one of ordinary skill in the art notice of the change from ordinary meaning." *Innova/Pure Water*, 381 F.3d at 1117. In addition, a court will adopt an alternative meaning of a term "if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention." *CCS Fitness*, 288 F.3d at 1367. For example, the presumption of ordinary meaning will give way where the

3

"inventor has disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction, representing clear disavowal of claim scope." *Gemstar-TV Guide Int'l Inc. v. ITC*, 383 F.3d 1352, 1364 (Fed. Cir. 2004). The disclaimer in the prosecution history must be "clear and unmistakable." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003). Likewise, the specification may be used to resolve ambiguity "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325.

However, limitations from the specification (such as from the preferred embodiment) may not be read into the claims, absent the inventor's express intention to the contrary. *Id.* at 1326; *see also CCS Fitness*, 288 F.3d at 1366 ("[A] patentee need not 'describe in the specification every conceivable and possible future embodiment of his invention.'") (quoting *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001)). To protect against this result, a court's focus should remain on understanding how a person of ordinary skill in the art would understand the claim terms. *Phillips*, 415 F.3d at 1323. Additionally, "[w]hen consulting the specification to clarify the meaning of claim terms, court must take care not to import limitations into the claims from the specification." *Abbott Laboratories v. Sandoz, Inc.*, 566 F. 3d 1282, 1288 (Fed. Cir. 2009).

Similarly, the Federal Circuit has repeatedly cautioned courts against reading limitations into the claims based on a preferred embodiment: "although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to these embodiments." *Phillips*, 415 F. 3d at 1323. Courts have also "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Liebel-Flarsheim Co. v. Medrard, Inc.*, 358 F. 3d 898, 906 (Fed. Cir. 2004).

If the analysis of the intrinsic evidence fails to resolve any ambiguity in the claim language, a court then may turn to extrinsic evidence, such as expert declarations and testimony from the inventors. *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003)

4

("When an analysis of *intrinsic* evidence resolves any ambiguity in a disputed claim term, it is improper to rely on extrinsic evidence to contradict the meaning so ascertained.") (emphasis in original).  When considering extrinsic evidence, a court should take care not to use it to vary or contradict the claim terms.  Rather, extrinsic evidence is relied upon more appropriately to assist in determining the meaning or scope of technical terms in the claims.  *Vitronics Corp. v. Conceptronic*, *Inc.*, 90 F.3d 1576, 1583-84 (Fed. Cir. 1996).

Dictionaries also may play a role in the determination of the ordinary and customary meaning of a claim term.  In *Phillips*, the Federal Circuit reiterated that "[d]ictionaries or comparable sources are often useful to assist in understanding the commonly understood meanings of words . . . ." *Phillips*, 415 F.3d at 1322.  The *Phillips* court, however, also admonished that district courts should be careful not to allow dictionary definitions to supplant the inventor's understanding of the claimed subject matter.  "The main problem with elevating the dictionary to . . . prominence is that it focuses the inquiry on the abstract meaning of the words rather than on the meaning of claim terms within in the context of the patent." *Id*. at 1321.  Accordingly, dictionaries necessarily must play a role subordinate to the intrinsic evidence.

In addition, a court has the discretion to rely upon prior art, whether or not cited in the specification or the file history, but only when the meaning of the disputed terms cannot be ascertained from a careful reading of the public record.  *Vitronics*, 90 F.3d at 1584.  Referring to prior art may make it unnecessary to rely upon expert testimony, because prior art may be indicative of what those skilled in the art generally understood certain terms to mean.  *Id.*

**B.     Claim Construction.**

**1.      "Asynchronous connection"**

The term "asynchronous connection" appears in Claims 1 and 18 of the '326 Patent, Claims 1 and 13 of the '639 Patent, and Claim 1 of the '529 Patent.

MasterObjects argues that the term "asynchronous connection" must be construed to mean "A connection that allows one side of the communication to communicate at the same time the other side is also communicating within a session." (Parties' Joint Claim Construction

United States District Court

For the Northern District of California

and Pre-hearing Statement ("Statement") at 2.)  Yahoo!, on the other hand, argued at the *Markman* hearing that "asynchronous connection" should be construed to mean "a connection that allows either side of the communication to initiate communications at any moment in time within a session."

Both parties agreed at the *Markman* hearing the term should be construed to include language that allows for the client and server to communicate with each other at the same time and both parties agreed that the language "within a session" should be included the claim's construction.  However, the parties dispute whether the asynchronous connection must allow the server as well as the user to "initiate" a communication within a session.  Under Yahoo!'s proposed construction, an "asynchronous connection" would allow the server to send requests to the client without any initial request from the client.

Claim 1 of the '529 Patent describes a system comprising "a communication protocol that enables an asynchronous connection" between a client and server, that "allows the client system to send . . . within a session . . . a lengthening string . . . of consecutively input characters . . . to the server . . . while asynchronously receiving consecutive responses form the server system as the characters are being input." ('529 Patent at 31:38-58.)  In Claim 1 of the '529 Patent, the client initiates and the server receives.

Yahoo! argues that the specification teaches that the server must also be able to initiate communication within a session.  Yahoo! cites to a paragraph in the specification that states: "The system is bi-directional and asynchronous, in that both the Client and the Server can initiate communications at any moment in time."  (*Id*. at 12:23-24.)  Yahoo! also relies on another sentence located within the same paragraph which states: "An example of a communication initiated by the Server is updating the information provided to the Client."  (*Id*. at 12:30-33.)  MasterObjects responds that the specification language cited by Yahoo! only describes a preferred embodiment of the invention.  *See Philips*, 415 F.3d at 1323 ("although the specification often describes specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments"); *see also Teleflex*, 299 F.3d at 1326 ("Limitations from the specification (such as from the preferred embodiment) may not be

1   read into the claims, absent the inventor's express intention to the contrary."); *see also CCS*

2   *Fitness*, 288 F.3d at 1366.

3            The Court agrees that Yahoo!'s analysis attempts to read limitations into the claim based

4   on a preferred embodiment.  The paragraph that Yahoo! relies on clearly refers to the

5   QuestObjects embodiment.  The section describing the embodiment provides:

6            In the detailed description below, an embodiment of the present invention is
         referred to as QuestObjects, and provides a system of managing client input,
7        server queries, server responses and client output.  One specific type of data
         made available through the system from a singe source (or syndicate of sources)
8        is referred to as a QuestObjects Service.

9   ('529 Patent at 9:49-54; *see also id*. at 9:6-8 ("In the detailed description below, the present

10  invention is described with reference to a particular embodiment named QuestObjects"); *see*

11  *also id*. at 31:33-36 ("The foregoing description of preferred embodiments of the present

12  invention has been provided for the purpose of illustration and description.  It is not intended to

13  be exhaustive or to limit the invention to the precise forms disclosed.").)  Accordingly, the

14  Court finds the language cited by Yahoo! only to refer to a limitation of a specific embodiment,

15  the QuestObjects system.

16           Yahoo! also argues that MasterObjects limited the construction of the term through

17  MasterObjects' prosecution history.  A party may limit the meaning of their claim language

18  when "the patentee has unequivocally disavowed a certain meaning to obtain his patent, the

19  doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim

20  congruent with the scope of the surrender."  *Omega Eng'g*, 334 F.3d at 1324.  Yahoo! cites to a

21  single sentence in MasterObject's prosecution history, located in the middle of a paragraph

22  which states: "Furthermore, since the system is *asynchronous*, both the client and the server can

23  initiate communications at any moment in time."  (Declaration of Kevin Smith ("Smith Decl."),

24  Ex. D at 12.)  In the preceding paragraph that Yahoo! cites to, the patentee discusses its

25  amendment to the system claim.  The paragraph states:

26           As defined by Claim 1, as currently amended, the system comprises a
         communication protocol that provides an asynchronous session-based connection
27       between a client and server.  As part of a session, *the client sends a plurality of*
         *consecutively input strings to query the server* for content . . . .  A server object
28       records, during the same session, each of the plurality of queries.  As the search
         string is being lengthened or shortened, the server object automatically matches

United States District Court
For the Northern District of California

7

the focused query string against the content of the server system, *and returns increasingly relevant content information to the client* for immediate use by the client system.

(*Id*. at 11-12) (emphasis added).  Further, the beginning of the paragraph to which Yahoo! cites provides:  "The advantages of such a session-based protocol included that the server *recognizes* when subsequent requests originate at the same client.  Thus, in *responding* to an input character the server *receives* from the client . . . ." (*Id*.) (emphasis added).

Here, in the cited prosecution history, MasterObjects explains the advantages of a session-based asynchronous connection.  MasterObjects does not argue that their invention is distinguishable because the server can initiate a communication with the client.  Rather, MasterObjects makes clear that an asynchronous connection *can* have a server initiate communications.   In its amendment, MaseterObjects states that as part of a session, the client first sends input to the server, and then the server returns increasingly relevant information.  MasterObjects, in the following paragraph, states that the advantage of the session-based protocol is that the server *recognizes* when requests *originate* at the client.  The language cited by Yahoo! describes how the asynchronous connection works *within a session*, that is, the client and server can communicate with one another whenever they please.

Accordingly, the Court does not find MasterObjects has unequivocally disavowed their construction of "asynchronous connection" in the prosecution history.  The Court construes the term "asynchronous connection" to mean:  "A connection the allows one side of the communication to communicate at the same time the other side is also communicating within a session."

### 2.     "Communication protocol"

The term "communication protocol" appears in Claims 1 and 18 of the '326 Patent, Claims 1 and 13 of the '639 Patent, and Claims 1, 44, and 45 of the '529 Patent.

MasterObjects argues that the term "communication protocol" should be construed to mean "A set of rules that enable computers to exchange messages with each other."  (Statement at 2.)  Yahoo!, on the other hand, argues that the term must be construed to mean "A set of rules or standards designed to enable computers to connect with one another and to exchange

8

1   information and that is optimized for sending single characters from a client to a server and lists

2   of strings from the server to the client." (*Id.*)

3        The key dispute between the parties is whether the protocol must be "optimized for

4   sending single characters from a Client to a Server and lists of strings from the server to the

5   client."

6        Yahoo!'s argues that when MasterObjects uses the language "*the invention includes . . .*

7   *a communication protocol . . . optimized for sending characters*," the construction of the term

8   "communication protocol" must be optimized for sending single characters.  The language

9   Yahoo! relies on in support of its proposed construction states:  "The invention includes a

10   Server that handles requests for information from clients, and a communication protocol that is

11   optimized for sending characters from a Client to the Server, and lists of strings from the Server

12   to the Client."  ('639 Patent at 13:58-62; '529 Patent at 11:55-59.)

13        The Court agrees with Yahoo! that a disclosure that begins with "the invention" should

14   be given more weight.  *See Trading Techs. Int'l v. eSpeed, Inc.*, 595 F.3d 1340, 1353 (Fed. Cir.

15   2010) (a "reference to 'the present invention' strongly suggests" that the patentee is not

16   describing a mere embodiment); *see also Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d

17   1312, 1318 (Fed. Cir. 2006) (finding the terms "this invention" and "the present invention" to

18   limit the claims).  However, the Court finds Yahoo! again attempts to read limitations into the

19   claims based on the QuestObjects preferred embodiment.

20        As the Court has previously discussed with respect to the term "asynchronous

21   connection," MasterObjects has explained that the "detailed description" is "an embodiment of

22   the present invention," that is, the QuestObjects preferred embodiment.  (*See* '529 Patent at

23   9:49-56.)  These "[l]imitations from the specification (such as from the preferred embodiment)

24   may not be read into the claims, absent the inventor's express intention to the contrary."

25   *Teleflex*, 299 F.3d at 1326 ; *see also CCS Fitness*, 288 F.3d at 1366.

26        Further, the single sentence Yahoo! relies on for its construction is embedded in the

27   middle of a long and detailed paragraph describing specific embodiments.  Read in context, the

28   specification states the following:  "The terms 'client' and 'server' are used herein to reflect a

United States District Court

For the Northern District of California

9

*specific embodiment* of the invention . . . .  The invention includes a Server . . . and a communication protocol that is optimized for sending single characters from a Client to the Server . . . ." ('529 Patent at 11:48-58 (emphasis added).)  In the sentence which Yahoo! relies upon for its construction, the terms server and client are capitalized indicating that the inventor is describing one of the specific embodiments that was just mentioned in the proceeding sentence rather than limiting the claimed invention.

Accordingly, the Court concludes that the specification does not clearly indicate an intention to limit "communication protocol" to a protocol that is optimized for sending single characters.  The Court construes the term "communication protocol" to mean:  "A set of rules that enable computers to exchange messages with each other."

**3.      "Content-based cache/query and result cache"**

The terms "content-based cache and query and result cache" appear in Claims 1, 44, and 45 of the '529 Patent and Claims 1 and 13 of the '639 Patent.

MasterObjects argues that the term "content-based cache and query and result cache" should be construed to mean "A cache which stores previous queries and content or other information returned in response to previous queries."  (Statement at 2.)  Yahoo!, on the other hand, argues that the term should be construed to mean "A persistent store of queries and corresponding result sets executed by a content engine for a specific content channel, thus improving performance on recurring queries and limiting the load imposed on content engines. Memory that stores an index file that aids in retrieval of queries and result sets, but does not store those queries and result sets, is not a cache."  (*Id.*)

As an initial matter, the parties agree that the terms "content-based cache" and "query and result cache" should be given the same construction.  The key dispute between the parties is whether Yahoo!'s proposed limitations should be included in the construction of the term.

The first issue is whether or not the glossary definition of "Content-based Cache" should be used to provide guidance to define the term.  Yahoo! argues the term requires including the word "persistent" and that queries and results must be executed by a "content engine for a specific content channel."  In support of its argument, Yahoo! cites to the glossary in the '529

10

Patent specification which states: "Content-based Cache - A persistent store of Queries and corresponding Result Sets executed by a Content Engine for a specific Content Channel." ('529 Patent at 10:17-19.)  However, courts have "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Liebel-Flarsheim*, 358 F.3d at 906; *see also MySpace, Inc. v. GraphOn Corp.*, 672 F.3d 1250, 1255 (Fed. Cir. 2012) ("limitations from parts of the written description, such as the details of the preferred embodiment, cannot be read into the claims absent a clear intention by the patentee to do so.").

Here, the glossary refers to a preferred embodiment, the QuestObjects system.  The paragraph proceeding the Glossary states:

> In the detailed description below, an *embodiment of the present invention* is referred to as QuestObjects, and provides a system of managing client input, server queries, server responses and client output.  One specific type of data made available through the system from a single course (or syndicate of sources) is referred to as QuestObjects Service.  *Other terms used to describe the QuestObjects system in detail can be found in the glossary below.*

('529 Patent at 9:49-56 (emphasis added).)  The patentee uses the glossary to describe one particular embodiment, the QuestObjects system.  Yahoo! seeks to import a specific limitation from a glossary which is expressly limited to a preferred embodiment.  This is not permitted. *See Liebel-Flarsheim*, 358 F.3d at 906.  Accordingly, the Court will not include the word "persistent" or the limitation of the content engine in construing the term.

Next, Yahoo! argues that MasterObjects' prosecution history evidences that the patentee has limited the scope of its claim and as a result the term should include the following limitation: "Memory that stores an index file that aids in retrieval of queries and results sets, but does not store those queries and results sets, is not a cache."  A patentee may limit the meaning of their claim language when "the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega Eng'g*, 334 F. 3d at 1324.

United States District Court

For the Northern District of California

1    Yahoo!'s argument is based on a rejection that MasterObjects received in light of the

2 prior art in the Curtis Patent.  Curtis, the prior art reference, refers to a search engine which

3 utilizes a method and system for efficient storage and retrieval of data.  (Smith Dec., Ex. J at

4 25.)  The Curtis system is comprised of an index file, wherein the index file contains locations

5 of data items, pointers to other index files, or an empty designation.  (*Id*.)  MasterObjects

6 distinguished itself from this prior art reference by arguing that Curtis "does not store queries

7 and result sets."  (*Id*.)  Further, in distinguishing Curtis from Claim 1 of the '529 Patent,

8 MasterObjects contended that "Curtis only stores URLs and information related to the URL in

9 an index file.  It is not clear to the Applicant whether Curtis shows a cache at all."  (*Id*. at 30.)

10    Yahoo! argues that MasterObjects distinguished its invention by claiming that an index

11 file of URLs and information related to URLs is not a "cache" and therefore MasterObjects had

12 disclaimed coverage of such index files.  However, MasterObjects did not make such an

13 argument before the Patent and Trademark Office.  MasterObjects simply argued that "the

14 cache stores previous queries and corresponding result sets" which Curtis does not store.  (*Id*. at

15 30.)  Accordingly, the Court does not find that MasterObjects has disclaimed any coverage in

16 light of their response to the Curtis rejection.

17    Lastly, Yahoo! argues that the purpose of the cache is to "improve performance and

18 reduce load on the system."  Yahoo! again cites to the glossary contained in the QuestObjects

19 embodiment.  As stated above, courts have "expressly rejected the contention that if a patent

20 describes only a single embodiment, the claims of the patent must be construed as being limited

21 to that embodiment."  *Liebel-Flarsheim*, 358 F.3d at 906.

22    The entire sentence of the language Yahoo! relies upon states: "The *QuestObjects*

23 Server caches query results in a cache that is common to all users, thus improving performance

24 on recurring queries and limiting the load imposed on content engines."  ('639 Patent at 8:11-15

25 (emphasis added).)  Here, the patentee explicitly refers to the QuestObjects preferred

26 embodiment.  The Court will not read these limitations in the preferred embodiment into the

27 claims.

28

United States District Court

For the Northern District of California

1    Accordingly, the Court construes the term "content-based cache/query and result cache"

2    to mean:  "A store of previous queries and corresponding result sets executed by the system."

3        **4.**    **"Unified query and result cache/unified query cache"**

4    The terms "unified query and result cache/unified query cache" appear in Claims 1 and

5    18 of the '326 Patent.  At the *Markman* hearing, Yahoo! stated they would not pursue

6    construction of any claims with respect to the '326 Patent.  Because this term only appears in

7    the '326 Patent, the Court will not construe "unified query and result cache/unified query

8    cache."

9        **5.**    **"Content source(s)"**

10    The term "content source(s)" appears in Claim 1 of the '326 Patent and Claims 1, 44,

11    and 45 of the '529 Patent.

12    MasterObjects argues that the term "content source(s)" must be construed to mean "A

13    server computer that provides information."  (Statement at 3.)  Yahoo!, on the other hand,

14    argues that the term must be construed to mean "A server computer that provides data to a third-

15    party application that is capable of performing string-based queries and returning string-

16    formatted answers to the system by accessing its own database or by querying other information

17    systems."  (*Id.*)

18    The key dispute between the parties is whether the limitation of a third-party application

19    should be construed in the term.  Yahoo! has also proposed additional limitations to the term,

20    namely that a content source is "capable of performing string-based queries."

21    Yahoo!'s proposed definition again comes from the glossary of the '639 Patent.  Yahoo!

22    cites to the glossary section:

23    Content Source

24    A server computer that provides the data that is accessed by the QuestObjects
      system.  The content source makes its data available through a content engine.

25    For best performance, the content source must be located on the same LAN as
      the QuestObjects Server, and could even be hosted on the very same server

26    computer.  The QuestObjects Server can be linked to any number of content
      sources.  To retrieve specific information from the content source, one or more

27    content channels are configured on the QuestObjects Server.

28

('639 Patent at 10:23-31.)  Yahoo! also points to the definition of "Content Engine" in the '639 Patent glossary and seeks to import those limitations into its proposed construction.  "Content Engine" is defined as "a third-party application that runs on the content source that is capable of performing string-based queries and returning string-formatted answers to the QuestObjects system."  (*Id.* at 10:13-15.)  Yahoo! argues that one must also look to the glossary definition of "Content Engine" fully to understand the meaning of "Content Source" given the fact that "content engine" is mentioned in the glossary definition of "Content Source."

As stated throughout this Order, the Court views the language which Yahoo! relies upon as a preferred embodiment of the invention.  *See Phillips*, 415 F.3d at 1323 ("although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments"); *see also Abbott Laboratories*, 566 F. 3d at 1288 ("[w]hen consulting the specification to clarify the meaning of claim terms, courts must take care not to import limitations into the claims from the specification.")

Here, the Court finds the glossary defines the QuestObjects embodiment.  (*See* '639 Patent at 6:18-21 ("In the detailed description below, embodiments of the present invention are described with reference to a particular embodiment named QuestObjects, created by the MasterObjects company.").)  Indeed, the first sentence Yahoo! relies upon for their proposed construction reinforces this point.  The definition of Content Source in the glossary clearly states the data is being accessed by the QuestObjects system, that is, the preferred embodiment.

Accordingly, the Court construes the term "Content Source" to mean:  "A server computer that provides the data that is accessed by the system."

### 6.    "Session/user session"

The terms "session/user session" appear in Claims 1 and 18 of the '326 Patent and Claims 1 and 13 of the '639 Patent.

MasterObjects argues that the terms "session/user session" should be construed to mean "A related set of communications between a client and a server as the user enters a particular search query by entering consecutive characters."  (Statement at 3-4.)  Yahoo!, on the other hand, argues that the term should be construed to mean "A state maintained between a client

14

1  and a single server in which the server recognizes when subsequent requests originate from the

2  same user such that information about the user's past queries is required to process the current

3  request." (*Id.*)

4        There are two key disputes with regard to the term "session." The parties first dispute

5  what actions are taken within a session. Secondly, the parties dispute whether the relationship

6  between the client and the server may include more than one server or if the client is limited to

7  communicating to a single server within a session.

8        Yahoo! makes two arguments regarding their proposed construction of the term

9  "session." Yahoo!'s first argument is premised on the language found in the specification of the

10  '529 and '639 Patents. The language Yahoo! relies upon provides:

11        In accordance with one embodiment of the invention the system is session-based,
          in that the server knows or recognizes when subsequent requests originate at the
12        same Client. Thus, in responding to a character the Server receives from a Client
          it can use the history of data that has been to and from the current user.
13

14  ('639 Patent at 14:12-17; '529 Patent at 12:9-14.) MasterObjects points to the "in accordance

15  with one embodiment . . . " language that Yahoo! relies on and argues that Yahoo! attempts to

16  take a narrow notion specific to one embodiment and read that limitation into the general

17  claims.

18        Here, MasterObjects expressly states that it describes an embodiment and is not

19  specifically defining the claims. The Court cannot find from this language a clear intent by

20  MasterObjects to read these limitations into the claims. *See MySpace*, 672 F.3d at 1255.

21  Accordingly the Court will not take into consideration the language cited from the specification

22  in construing the term "session."

23        The second dispute between the parties is whether the relationship between the client

24  and the server is tied to a single server. MasterObjects argues the plain meaning of the term

25  "session" is set out in Claim 1, which states: " . . . and within a session between the client

26  system and the *server system* . . . ." ('529 Patent at 31:46-32:33 (emphasis added).)

27  MasterObjects contends that the language of Claim 1 refers to a *server system* as opposed to a

28  single server. Additionally, MasterObjects' specification also states that there can be multiple

15

United States District Court

For the Northern District of California

1    servers involved in the back end. (*See* '529 Patent at 5:67-6:2 ("A plurality of servers can be

2    used . . .").)  The Court agrees with MasterObjects in that a plurality of servers may be used in

3    the patent, but the issue is whether a plurality of servers and a client communicate *within a*

4    *session*.

5             Yahoo! cites to examples from the prosecution history in support of their argument that

6    a "session" is limited to a single server.  In reviewing the prosecution history, the scope of

7    coverage of the claims may change if the court finds the patentee has "relinquished [a] potential

8    claim construction in an amendment to the claim or in an argument to overcome a reference."

9    *See Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 979 (Fed. Cir. 1999); *see also Southwall*

10   *Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1584 (Fed. Cir. 1995) ("Clear assertions made

11   during prosecution in support of patentability, whether or not actually required to secure

12   allowance of the claim, may also create an estoppel.").  To invoke argument-based estoppel, the

13   prosecution history must evince a "clear and unmistakable surrender of subject matter."  *Eagle*

14   *Comtronics, Inc. v. Arrow Commc'n Labs., Inc.*, 305 F.3d 1303, 1316 (Fed. Cir. 2002) (quoting

15   *Pharmacia & Upjohn Co. v. Mylan Pharm., Inc.*, 170 F.3d 1373, 1377 (Fed. Cir. 1999).

16            Yahoo! argues that MasterObjects limits a "session" to a single server when

17   MasterObjects distinguished themselves from the Purcell prior art reference.  Yahoo! cites the

18   patentee's argument for traversing the Purcell prior art rejection:

19              [I]n Purcell, the primary goal is to allow a single query from a client to be
               simultaneously applied against multiple databases in a network.  The system
20             disclosed therein provides that any of the multiple databases that cannot service
               the specific client query return an empty result (indication for example "sorry, I
21             can't fulfill that request").  Indeed, it appears more advantageous to have a
               network-wide dispersal of the queries, so as to maximize the chances that at least
22             one of the servers can provide the desired data, rather than to have those queries
               contained within a single session between a single client and a single server.
23             The system then allows another database in the network that can fulfill the
               request to return the requested data.  As such, Applicant respectfully submits that
24             Purcell does not disclose a *session-based* environment . . . .  Instead, Purcell
               appears to disclose a traditional synchronous means of requesting information,
25             and not one that uses a session, as presently defined.

26   (Smith Decl., Ex. D at 13 (emphasis in original).)  Here, MasterObjects appears to distinguish

27   itself from the prior art by describing how the Purcell system works:  dispersing client queries

28   to multiple servers to maximize the chances that one of the servers can return the data, "rather

16

United States District Court

For the Northern District of California

1    than to have those queries contained in a single session between a single client and a single

2    server." (*Id.*)  Immediately following this distinction, MasterObjects states "a[s] such . . .

3    Purcell does not disclose a *session-based* environment." (*Id.* (emphasis in original).)

4         MasterObjects made the argument that Purcell can be distinguished from its present

5    invention because Purcell is not "session-based" given the use of multiple servers.

6    MasterObjects then states Purcell does not "use a session, as presently defined." (*Id.*)  Thus, the

7    Court finds that MasterObjects has clearly and unmistakably disclaimed a multiple-server

8    system during prosecution of its patents.

9         Accordingly, the Court construes the term "session" to mean:  "A relationship

10   maintained between a client and a single server in which the server recognizes when

11   consecutive requests originate from the same client."

12        **7.    "Increasingly appropriate content or search criteria" and**
           **"Increasingly relevant content"**

13

14        The term "increasingly appropriate content or search criteria" appears in Claim 18 of

15   the '326 Patent and Claims 44 and 45 of the '529 Patent.  MasterObjects argues this term should

16   be given its plain meaning.  Yahoo!, on the other hand, argues that the term is not amenable to

17   construction and the claims containing them are invalid as indefinite.

18        The term "increasingly relevant content" appears in Claims 1 and 18 of the '326 Patent

19   and Claims 1 and 13 of the '639 Patent.  MasterObjects argues this term should be given its

20   plain meaning.  Yahoo!, on the other hand, argues that the term is not amenable to construction

21   and the claims containing them are invalid as indefinite.

22        At the *Markman* hearing, MasterObjects argued that the Court should not address the

23   question of indefiniteness until the parties have been able to conduct expert testimony.

24   Alternatively, Yahoo! argued that even with expert testimony the terms in dispute would still be

25   indefinite because they are ordinary words that do not have any particular meaning.

26        "In determining whether the claim is sufficiently definite, we must analyze whether 'one

27   skilled in the art would understand the bounds of the claim when read in light of the

28   specification.'" *Allen Eng. Corp. v. Bartell Indus. Inc.*, 299 F.3d 1336, 1348 (Fed. Cir. 2002)

(quoting *Personalized Media Communications, LLC. v. Int'l Trade Comm'n*, 191 F.3d 696, 705 (Fed. Cir. 1998)).  Claims that are "'not amenable to construction or [are] insolubly ambiguous are indefinite." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1371 (Fed. Cir. 2008) (quoting *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005)).  "Because a patent is presumed to be valid," the "evidentiary burden to show facts supporting a conclusion of invalidity is one of clear and convincing evidence." *Automotive Tech. Int'l Inc. v. BMW of North Am., Inc.*, 501 F.3d 1274, 1281 (Fed. Cir. 2007) (citing *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1238-39 (Fed. Cir. 2003)).

Second, rather than giving meaning to a claim, as a *Markman* hearing is meant to do, indefiniteness invalidates the patent claims entirely. *Exxon Research & Eng'g Co. v. United States,* 265 F.3d 1371, 1376 (Fed. Cir. 2001). This dispositive effect is more appropriately tackled at summary judgment.  Thus, this Court finds persuasive the determinations of several other courts to defer indefiniteness until summary judgment.  *See, e.g., Intergraph Hardware Techs. Co. v. Toshiba Corp.,* 508 F. Supp. 2d 752, 773 n.3 (N.D. Cal. 2007) ("[The] indefiniteness argument is inappropriate at the claim construction stage."); *Pharmastem Therapeutics, Inc. v. Viacell, Inc.,* 2003 WL 124149, at *1 n.1 (D. Del. Jan. 13, 2003) ("[T]he court will not address the defendants' indefiniteness argument at [the *Markman* stage].").  Indeed, the Federal Circuit in *Halliburton, Exxon,* and *Datamize* reviewed courts that dismissed the case for indefiniteness at summary judgment, not at a prior *Markman* hearing.  *Halliburton,* 514 F.3d at 1249; *Exxon,* 265 F.3d at 1373; *Datamize, LLC v. Plumtree Software, Inc.,* 417 F.3d 1342, 1347 (Fed. Cir. 2005).

Accordingly, the Court holds that the claims are sufficiently definite to survive claim construction and will defer the indefiniteness argument until a more appropriate time.

## CONCLUSION

Based on the analysis set forth above, the Court adopts the foregoing constructions of the disputed terms.  The parties are ordered to submit a further joint case management report pursuant to Patent Standing Order ¶ 13 by no later than February 7, 2014.  The Court shall hold

///

1    a case management conference in this consolidated matter on February 21, 2014 at 1:30 p.m.

2         **IT IS SO ORDERED.**

3

4    Dated: November 26, 2013

5                                                    JEFFREY S. WHITE
                                                     UNITED STATES DISTRICT JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

19